## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

**SECURITIES AND EXCHANGE
COMMISSION,**
    **Philadelphia Regional Office
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103,**

                         **Plaintiff,**

          **v.**

**DENNIS M. JALI,
JOHN E. FRIMPONG,**
    **15602 Rising Castle Court,
Upper Marlboro, MD 20772
(Prince George's County),**
**ARLEY R. JOHNSON,**
    **15012 Dahlia Drive,
Bowie, MD 20721
(Prince George's County),**
**THE SMART PARTNERS LLC,**
    **9500 Medical Drive, Suite 340
Largo, MD 20774
(Prince George's County), and**
**1ST MILLION LLC,**
    **9500 Medical Drive, Suite 340
Largo, MD 20774
(Prince George's County),**

                     **Defendants,**

**and**

**ACCESS2ASSETS, LLC,**
    **1401 Mercantile Lane
Upper Marlboro, MD 20774
(Prince George's County),**

                **Relief Defendant.**

Case No. _____

**JURY TRIAL DEMANDED**

## **COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendants Dennis M. Jali ("Jali"), John E. Frimpong ("Frimpong"), Arley R. Johnson ("Johnson"), The Smart Partners LLC ("Smart Partners"), and 1st Million LLC ("1st Million") (collectively, "Defendants"), and relief defendant Access2Assets, LLC ("Access2Assets") and alleges as follows:

## SUMMARY

1.      From 2017 to May 2019, Jali, Frimpong, and Johnson, directly and through two entities created to perpetrate the scheme, Smart Partners and 1st Million (the "Companies"), fraudulently raised more than $27 million from approximately 1,200 investors, many of them African immigrants.

2.      To commit this fraud, Defendants exploited common ancestry and/or religious affiliations to earn investors' trust.  Many of the investors were health care workers and/or members of churches attended by Jali, Frimpong, and/or Johnson.

3.      Defendants represented to investors that Jali and a team of skilled and licensed traders would invest their funds in foreign currency exchange ("Forex") and purported "cryptocurrency" trading, and guaranteed substantial monthly or quarterly returns while simultaneously protecting their principal from market forces.  Defendants further promised to return each investor's principal after 12 months.  None of these statements were true.

4.      Rather than invest money received from these targeted communities and others as promised, Defendants misappropriated investor funds for the personal use of Jali, Frimpong, and Johnson, and to temporarily keep the scheme afloat by making Ponzi payments to earlier investors.

5.      By May 2019, the scheme collapsed when Defendants lacked sufficient funds to make promised payments to investors and Jali fled to his native South Africa.

6.      By engaging in the conduct described in this complaint, Defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R § 240.10b-5.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77t(d), and Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e), to enjoin such acts, transactions, practices, and courses of business, to obtain disgorgement, prejudgment interest, and civil money penalties, and such other and further relief as the Court may deem just and appropriate.

8.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act, 15 U.S.C. §§ 77t and 77v, and Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa.

9.      Venue in this district is proper pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a).  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within this district, including that Defendants made misrepresentations and engaged in deceptive conduct affecting investors residing within this district.  In addition, Frimpong and Johnson reside in the district and this district was the principal place of business for Smart Partners, 1st Million, and relief defendant Access2Assets.

## DEFENDANTS

10.     **Dennis M. Jali**, age 35, is a native of South Africa who resided in Chevy Chase,

Maryland from 2016 until May 2019.  Jali was the founder, owner, and Chief Executive Officer

("CEO") of Smart Partners and 1st Million, and the founder and owner of Access2Assets, each

of which is described more fully below.  Jali also purported to be a pastor and preached at

several churches.

11.     **John E. Frimpong**, age 40, is a native of Ghana who resides in Upper Marlboro,

Maryland.  Frimpong was the Chief Financial Officer ("CFO") of Smart Partners and 1st Million

and was affiliated with a church in or around Bowie, Maryland where Jali sometimes preached.

12.     **Arley R. Johnson**, age 61, is a resident of Bowie, Maryland.  Johnson was the

Chief Operating Officer ("COO") of Smart Partners and1st Million and purports to be a minister.

13.     **The Smart Partners LLC** is a Delaware limited liability company formed in

2017 with its principal place of business in Upper Marlboro, Maryland.  Jali owned, controlled,

and was CEO of Smart Partners, which often operated under the name "1st Million Dollars."

14.     **1st Million LLC** is a Maryland limited liability company formed in 2019 with its

principal place of business in Upper Marlboro, Maryland.  Jali owned, controlled, and was CEO

of 1st Million.

## RELIEF DEFENDANT

15.     **Access2Assets, LLC** is a Maryland limited liability company with its principal

place of business in Upper Marlboro, Maryland.  Access2Assets is a purported wealth

preservation and asset management company owned and controlled by Jali and operated with the

assistance of Frimpong and others.

## FACTS

**I.    DEFENDANTS OFFERED AND SOLD FRAUDULENT INVESTMENT CONTRACTS AND LIMITED PARTNERSHIP INTERESTS**

### A.    Overview of the Fraudulent Scheme

16.    In 2017, Jali, with the assistance of Frimpong, formed Smart Partners as a purported financial consulting and private trading company with a claimed specialty in cryptocurrency and Forex trading.

17.    Smart Partners often conducted business in the name 1st Million Dollars.  Before forming 1st Million in 2019, Jali and Frimpong claimed that 1st Million Dollars was owned by or affiliated with Smart Partners, and generally used the names Smart Partners and 1st Million interchangeably.

18.    Jali, who falsely held himself out to investors as a self-made millionaire and an expert Forex and cryptocurrency trader, maintained bank accounts for Smart Partners and 1st Million into which investor funds were deposited via check, cash, or wire transfer.

19.    Frimpong, like Jali, falsely claimed to be an expert Forex and cryptocurrency trader, but in reality, his role was to solicit investors for the Companies.

20.    In early 2018, Jali hired Johnson to manage payroll and make the periodic payments to investors from a bank account for Smart Partners on which Johnson was an authorized user.  Johnson also solicited investors for the Companies.

21.    Frimpong and, beginning in 2019, Johnson were compensated for bringing new investors into the Companies based on a percentage of the amount invested.

22.    To give the appearance of legitimacy, Jali rented office space in Upper Marlboro, Maryland, which Frimpong, Johnson, and others used to conduct in-person meetings with prospective investors.

23.     Jali and Frimpong also operated and controlled a website for the Companies, and created, or caused to be created, marketing documents, including pamphlets, to distribute to prospective investors.

24.     In addition to the website, Defendants solicited investors for the Companies by word-of-mouth referrals.  As the scheme progressed, Defendants reached an even greater audience by soliciting through live investor presentations typically held in hotel ballrooms or other rented meeting spaces.

25.     Jali, Frimpong, Johnson, and others acting at their direction, spoke during these investor presentations and vouched for the Companies and the purported investments.

26.     By October 2018, Johnson was aware that Jali had been involved in an alleged fraudulent scam in South Africa.  Johnson investigated or knew others who investigated this conduct.  Despite these warnings, Johnson accepted Jali's denial of the allegations and continued to solicit investors for the Companies.

### 1.     The Purported Investment Contracts and Limited Partnership Agreements

27.     From 2017 to May 2019, Defendants offered and sold to investors in Maryland and several other states, including Georgia, Florida, and Texas, among others, contracts with the Companies in which they falsely promised, among other things, to generate profits for investors by trading Forex and cryptocurrency.

28.     Defendants typically solicited a minimum $5,000 investment from individuals and pledged, both orally and on written rate sheets, monthly or quarterly rates of return of between 6% and 42% of the investors' principal.

29.     Upon investment, Defendants provided all, or nearly all, investors with written contracts typically titled "Corporate Guarantee."  The Corporate Guarantee set forth the fundamental terms of the purported investment and was signed by Jali as the CEO.

30.     Jali, Frimpong, and Johnson reviewed the Corporate Guarantee and rate sheet with investors.

31.     On or about March 1, 2019, Defendants offered certain investors a limited partnership opportunity in a purported new entity, First Million, LLP (the "LLP").  Jali, Frimpong, and Johnson pressured investors to invest in the LLP as funds were running low in the Companies.

32.     Although a few investors invested in the LLP, no actual limited partnership interests were created.  The LLP did not exist and was simply a continuation of the ongoing fraud.

33.     Defendants did not use investor funds to trade Forex or cryptocurrency or create limited partnership interests as promised, but instead misappropriated investor funds.

        **2.     Defendants Targeted African Immigrants, Health Care Workers, and Church Members**

34.     To attract investors to the fraud, Defendants exploited the common ethnic and/or religious affiliations of Jali, Frimpong, and Johnson.

35.     For instance, Jali, who was from South Africa, and Frimpong, who was from Ghana, primarily targeted recent African immigrants, many of whom worked in the medical field.

36.     These health care workers were not sophisticated investors and often heard about the purported investment opportunity from co-workers who had invested with Defendants and were receiving payments.

37.     Certain of these health care workers pooled money together and formed investment groups to invest in the scheme because they were told that doing so would garner a higher rate of return.

38.     To further target African immigrants, Defendants videotaped a live investor presentation on at least one occasion and made it available to the public on a website called "Afrique Today."

39.     Jali, Frimpong, and Johnson also used religious affiliations to attract investors to the scheme.

40.     Jali preached at local churches, including the church Frimpong attended, and solicited investments from parishioners during church services, at times giving certain parishioners cash as a sign of his purported wealth and success as a trader.

41.     Johnson, a supposed minister, often invoked religion when soliciting investments for the Companies, claiming that there was a "spiritual component" to the Companies, and they worked under the "auspices of God."

### 3.     Defendants Used Unwitting Existing Investors to Vouch for Their Scheme

42.     Defendants also recruited existing investors to become "agents" of the Companies and recruit new investors in exchange for some type of compensation, such as a monetary payment or higher rates of return.

43.     On many occasions, these "agents" attended Defendants' live investor presentations to vouch for the purported investment, answer questions, and describe the monthly payments they received.

**B.     Defendants Made Material Misrepresentations and Omissions and Engaged in Deceptive Conduct**

44.     From 2017 through May 2019, Defendants used deceptive conduct and made the material misstatements and omissions discussed herein to induce more than 1,200 investors located in multiple states, including Maryland, to invest more than $27 million with the Companies.

45.     Defendants, orally and in writing, (1) falsely guaranteed investors monthly and quarterly returns and the return of their principal investment; (2) falsely touted trader qualifications and investment results; (3) falsely held Smart Partners and/or 1st Million out as a "public" company that was in some way "registered" and bonded; (4) falsely represented that principal investments would be held for safekeeping in a non-existent "trust account"; (5) used professionals to vouch for the scheme; and (6) lied about the use of investor funds.

**1.     Defendants Falsely Guaranteed Investment Returns**

46.     Defendants falsely claimed to earn profits for investors by trading in Forex or cryptocurrency, while simultaneously guaranteeing monthly or quarterly returns and protecting investors' principal from market forces.

47.     For example, in a Corporate Guarantee dated May 2, 2018, an investor agreed to invest $23,500 in cryptocurrency in exchange for guaranteed monthly payments equal to 25% of her principal investment and the return of her initial investment after 12 months.

48.     The Corporate Guarantee stated, in relevant part, that:

> The Cryptocurrency Contract valued at $23,500.00 plus the 25% monthly of the capital payable after every 30 days from the initial date of the contract.  THIS IS FIXED TO A MAXIMUM OF $70,500.00 REGARDLESS OF THE CRYPTO VALUE OR PRICES ON THE MARKET.  After a 12 month period in which the Debtor has fully paid the monthly credit amount . . . to the Lender, the initial amount invested will be returned to the Lender.

49.     The Corporate Guarantee for the purported Forex trading similarly guaranteed periodic returns based on a percentage of the principal investment and the return of the principal investment after 12 months.  One such agreement, dated March 12, 2019, provided, in relevant part, that:

> The Investment in Forex Trading Contract valued at $260,000 plus 20% monthly of the capital payable after every 30 days from the initial date of the contract.  THIS IS FIXED TO A MAXIMUM OF $639,741.00 REGARDLESS OF THE FOREX MARKET CURRENCY VOLITILITY ON THE MARKET.  After a 12 month period in which the Guarantor has fully paid the monthly credit amount . . . to the Lender, the initial amount invested will be returned to the Lender.

50.     Marketing documents for the Companies similarly falsely guaranteed investors monthly returns, claiming that "[b]ecause we are able to forecast and predict trends in Cryptocurrency and Forex, we guarantee our clients a 6% monthly payout on a minimum startup principal of $5,000.00."

51.     Jali, Frimpong, and Johnson repeated these lies to investors during live investor presentations and in one-on-one meetings with prospective investors by guaranteeing them monthly or quarterly investment returns and the return of the investors' principal after 12 months.

52.     Defendants' representations guaranteeing investor returns were bogus.  As Defendants well knew, any investment returns received by investors were not derived from trading profits, but rather from new funds brought into the scheme from unsuspecting investors.

## 2.     Defendants Misrepresented the Companies' Purported Traders and Improbable Trading Results

53.     Defendants made materially false and misleading statements to investors, orally and in writing, about the Companies' alleged traders and their trading results.

54.     The Companies' website and/or marketing documents falsely claimed that:

10

      a.     1st Million was "founded by Forex Traders with . . . years of experience, Lawmakers, Bankers and IT Programmers";

      b.     "The team at 1st Millions [*sic*] Dollars are [*sic*] made up of experienced professionals in their fields," including "Lawmakers, Blockchain Analysts, Bankers and Forex Traders," as well as "13 PRIVATE FOREX TRADERS" and "10 EXPERIENCED STOCK TRADERS";

      c.     Jali was a "licensed Forex trader," "an experienced and seasoned Forex Trader," and "an expert in trade forecasting and analysis [with] a high closing profit ratio"; and

      d.     "[S]o far the company has made gains of up to 1700% over the period of less than years [*sic*]."

55.     During live investor presentations and in-person meetings with prospective investors, Jali, Frimpong, and Johnson repeated these lies, telling investors about the non-existent trading licenses and other legal qualifications that the Companies and traders purportedly possessed.

56.     For example, in or about April 2019, during an in-person meeting at the Companies' office, Johnson falsely told a prospective investor who worked in the health-care field that Jali was a Wall Street trader who was licensed by the state of Maryland.

57.     Similarly, during a January 2019 meeting, Johnson falsely told a prospective investor that 1st Million had a team of young traders, all of whom were licensed, even though Johnson knew no team of traders worked in the Companies' office.

58.     In addition, Frimpong and Johnson often told prospective investors that Jali was a "trading genius" who never lost money regardless of market conditions.

59.     To support these fraudulent statements, Frimpong created a fake certificate purportedly issued to him by the Financial Industry Regulatory Authority, Inc. ("FINRA") that set forth various securities licenses.  FINRA did not issue the certificate and Frimpong held no such licenses.

60.     Frimpong showed this fake FINRA certificate to at least one investor who asked to see Frimpong's qualifications.

61.     Contrary to Defendants' statements and representations, the Companies were not founded by experienced professionals, did not employ teams of traders, and no one held appropriate trading licenses.

### 3.     Defendants Misrepresented That the Companies Were Public, Registered, and Bonded

62.     The website and marketing documents claimed that 1st Million "went public" years ago "as a private registered trading company in the United States."  This was not true.

63.     The Companies were never registred with the Commission or any other financial industry regulator.  Moreover, the Companies had no shareholders and, instead, were controlled solely by Jali and Frimpong.

64.     Marketing documents also falsely represented that 1st Million was a "bonded and licensed Forex trading company," when no such bonds or licensure existed.

65.     Similarly, during an in-person meeting in or about April 2019, Johnson told a prospective investor that 1st Million was a licensed company, which was untrue.

### 4.     Defendants Lied About Securing Investor Funds in a Trust Account

66.     A marketing pamphlet for 1st Million falsely assured investors that "[c]lient funds are placed into a Trust Account which makes the client a beneficiary of 1st Million Dollars as long as they hold an account with our company."

67.     During group presentations and in meetings with individual investors, Jali, Frimpong, and Johnson gained investors' confidence by touting the fabricated "trust account" safety net and told investors that their initial investments were secure.

68.     Jali, Frimpong, and Johnson repeatedly assured investors that their investments would be protected in a trust or escrow account, even though there was no documentation to show that such an account existed.

69.     For example, in or around January 2019, Johnson told a prospective investor that 1st Million secures an investor's principal investment by placing the principal in a separate trust account managed by a bank.

70.     During this same January 2019 meeting, Jali reaffirmed for the investor that the investment was guaranteed because of the trust account.

71.     Despite Defendants' written and oral representations, there was no trust account that protected the investors' principal investment.

### 5.      Defendants Used Professionals to Vouch for the Scheme

72.     To emphasize the supposed legality of the enterprise, Jali hired an attorney ("Counsel") and claimed that Counsel was ensuring compliance with all applicable legal requirements.  This was not true.

73.     On March 1, 2019, during a large investor presentation in National Harbor, Maryland, Frimpong introduced Counsel to the attendees as the "legal person . . . who represents us with the SEC, the federal government to make sure that the contracts that you sign we as a company have to fulfill."

74.     Counsel, in turn, told the group of investors that he had come to the Companies with a "suspicious mind" and, as the "watcher on the wall," he ensured that the "structures are in place that protect" the investors.

13

75.     In reality, Counsel had done little meaningful legal work for the Companies, and never represented Defendants before the Commission or ensured the Companies' compliance with the federal securities laws.

76.     In or about early 2019, Jali hired a third-party accountant (the "Accountant") to provide an alleged financial statement for the Companies, but denied the Accountant access to relevant records, providing him with false information instead.

77.     At Jali's behest, the Accountant produced a purported certified financial statement, even though he did not have access to the appropriate records, and falsely claimed in the document to be a Certified Public Accountant ("CPA").

78.     During the March 1, 2019 investor presentation at National Harbor, Maryland, the Accountant repeated these lies, falsely representing himself as a CPA, and telling the attendees of the meeting that he had dug "deep, several layers deep, into the numbers."

79.     The Accountant further assured the attendees that "the financials that you see in that, in that booklet, it's real.  Because if it wasn't on the up and up, I would be running."

80.     Contrary to these statements, the financial statement was not "real" but rather was based on false information designed to mislead investors about the nature of the Companies.

### 6.     Defendants Misrepresented the Use of Investor Proceeds and Misappropriated Investor Funds

81.     Contrary to Defendants' repeated representations that they would use investor funds to trade Forex or cryptocurrency or create limited partnership interests, Defendants did not invest the money as promised.  Instead, Defendants misappropriated more than $27 million of investor funds for the personal use of Jali, Frimpong, and Johnson, to make Ponzi payments to earlier investors, and to operate the Companies, including to pay purported salaries to Frimpong, Johnson, and others.

82.    Jali used investor funds to pay for, among other things, two luxury cars, private jet charters, airfare and hotels, extravagant retail purchases (including purchases at Gucci, Tory Burch, and Burberry), and a down payment for a house in Atlanta.

83.    Jali's personal expenses were totally unrelated to cryptocurrency and Forex trading, and were contrary to the explicit statements in the Corporate Guarantee, on the website, and in marketing documents concerning the intended use of investor proceeds.

84.    Jali also converted at least $9 million of investor funds to Bitcoin for his personal use and diverted at least $781,250 of investor funds to another company he owned and controlled, Access2Assets, which had no legitimate claim to these funds and did not provide money, goods, services, or anything else of value in exchange for these funds.

85.    In addition to their salaries, Frimpong and Johnson also took additional investor funds from the Companies.

86.    For example, Frimpong received more than $150,000 from Smart Partners as a purported return on a $53,000 investment.

87.    Between December 2018 and January 2019, Johnson took approximately $70,000 of investor funds in cash withdrawals and two checks totaling $35,000 that he wrote to himself from the Smart Partners' bank account.

88.    In an effort to keep the scheme afloat, Defendants used approximately $15.7 million of investor funds to repay prior investors in the form of Ponzi payments.

89.    Jali instructed Johnson to make approximately $3.4 million of those Ponzi payments to certain investors using Bitcoin to give the false appearance that the investment returns were generated from cryptocurrency trading.

90.     The Ponzi payments typically made by Johnson were instrumental in perpetuating the Defendants' scheme.  Investors' initial skepticism was assuaged when a friend or family member who also had invested received payments as promised.

91.     Defendants never informed investors that their funds would be used to pay for the personal expenses of Jali, Frimpong, or Johnson, or to repay earlier investors.

92.     Defendants used the remaining funds to operate the Companies in an attempt to give the businesses the appearance of legitimacy.

**C.     The Scheme Collapses and Jali Flees to South Africa**

93.     By February of 2019, the amount of money Defendants owed investors exceeded new investor funds coming into the scheme, and over the next three months, many of the investors' payment checks bounced.

94.     Johnson knowingly wrote checks to investors from bank accounts with insufficient funds.  In or around March 2019, Johnson issued approximately $100,000 worth of checks to investors that bounced, yet Johnson continued to solicit investments for the Companies.

95.     In April 2019, Johnson issued approximately $700,000 worth of checks to investors that bounced and some of the Companies' bank accounts were frozen.

96.     On May 18, 2019, Jali and Frimpong invited investors to a meeting during which they announced the dissolution of the Companies and promised each investor a "settlement" equal to their "dividends" prorated to May 17th and the return of their principal.  A few weeks later, Jali fled to South Africa.

97.     Although Jali, Frimpong, Johnson, and other staff continued to promise the so-called settlements, investors received only a series of false statements and excuses, and none were ever paid.

## II.     DEFENDANTS VIOLATED THE FEDERAL SECURITIES LAWS

98.     The investment contracts and limited partnership interests offered and sold by Defendants (the "Securities") were securities within the meaning of the Securities Act and the Exchange Act.

99.     The investments were all in a common enterprise run by Defendants, with the expectation of profits to be derived solely from the efforts of Defendants.  Investors played no role in management or operations of the Companies described herein.

100.     Defendants sold the Securities as investments, and the purchasers of these instruments invested with the expectation of profit.

101.     Defendants sold the Securities to hundreds of individual members of the general public, including those individuals who pooled their money specifically to purchase the Securities.

102.     Defendants engaged in the conduct described herein, including the offer and sale of the Securities, by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, by use of the mails, and/or the facility of a national securities exchange.

103.     Defendants knowingly made material untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.    A reasonable investor would consider the misrepresented facts and omitted information—including but not limited to, misrepresentations and omissions regarding the guaranteed return of their principal investment after 12 months; the qualifications and licenses of the alleged traders and their fictitious trading results; the maintenance of investor funds in a trust account; and the use of investors' money to, among other things, pay existing investors and finance Jali's extravagant lifestyle—important in deciding whether to purchase the Securities.

105.    The untrue statements of material fact and material omissions described herein were made in the offer or sale and in connection with the purchase or sale of securities.

106.    In connection with the conduct described herein, Defendants acted knowingly or recklessly.  Defendants knew or were reckless in not knowing that they were making material misrepresentations and omitting to state material facts necessary to make certain statements not misleading under the circumstances.

107.    Defendants obtained money or property by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Investors sent money directly to Defendants – more than 1,200 investors gave Defendants more than $27 million.  Defendants pooled investors' money into bank accounts and represented that they would use those funds to trade in Forex and cryptocurrency.  Jali, Frimpong, and Johnson took money for themselves and to make Ponzi payments to existing investors.

109.    Defendants used devices, schemes, and artifices to defraud investors, and engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon investors.

110.    In addition to the numerous misrepresentations discussed herein, among other things, Defendants created fictitious Corporate Guarantees to provide investors with a false sense of security in their investment; Jali obtained a fraudulent certified financial statement to give a false air of legitimacy to the Companies; Frimpong created a fake FINRA certificate for himself setting forth various false credentials and securities licenses; and Jali directed Johnson to make Ponzi payments using investor money to pay existing investors as purported profits and returns of principal.

## III.    RELIEF DEFENDANT ACCESS2ASSETS BENEFITED FROM THE FRAUD

111.    Access2Assets benefited from Defendants' fraudulent scheme.  Defendant Jali diverted to Access2Assets at least $770,000 that came from investors who were told that they were investing with 1st Million.

112.    Access2Assets received the money and other assets described herein as a result of Defendants' material misrepresentations, omissions, and other deceptive acts in connection with their offer and sale of the securities described herein.

113.    Access2Assets did not provide money, goods, services, or anything else of value in exchange for these funds.

114.    These transfers of funds to Access2Assets were part of, and in furtherance of, the securities laws violations alleged herein.  Therefore, Access2Assets has been unjustly enriched.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Against All Defendants)**

115.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 114, above, as if the same were fully set forth herein.

116.     As a result of the conduct alleged herein, Defendants, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or the mails:

        a.     knowingly or recklessly employed devices, schemes, or artifices to defraud;

        b.     knowingly, recklessly, or negligently obtained money or property by means of any untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.     knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

117.     By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against All Defendants)**

118.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 114, above, as if the same were fully set forth herein.

119.     As a result of the conduct alleged herein, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

        a.     employed devices, schemes or artifices to defraud;

b.      made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

120.    By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF
### Equitable Disgorgement of Ill-Gotten Funds
### (Against Relief Defendant Access2Assets)

121.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 114, above, as if the same were fully set forth herein.

122.    Relief Defendant Access2Assets obtained funds and property as a result of the violations of the securities laws by Defendant Jali.

123.    Relief Defendant Access2Assets obtained the gains described above as part, and in furtherance of, the securities law violations alleged above, under circumstances where it is not just, equitable, or conscionable for it to retain them.

124.    Relief Defendant Access2Assets should be required to disgorge all ill-gotten gains which inured to it benefit under the equitable doctrines of disgorgement, unjust enrichment, and/or constructive trust.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

### II.

Ordering Defendants to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint;

### III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and/or Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

### IV.

Ordering Relief Defendant Access2Assets to disgorge all ill-gotten gains to which it does not have a legitimate claim that it received as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon;

### V.

Retaining jurisdiction of this action for purposes of enforcing any final judgment and orders; and

### VI.

Granting such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission herby requests trial by jury.

Respectfully submitted,

Dated:  August 28, 2020

/s/ Karen M. Klotz
Jennifer C. Barry (Bar ID: 807403)
Karen M. Klotz (Bar ID: 811310)
Assunta Vivolo*
Matthew S. Raalf*
Katie E. Hopkins*
SECURITIES AND EXCHANGE COMMISSION
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
BarryJ@sec.gov
KlotzK@sec.gov

*Attorneys for Plaintiff Securities and Exchange Commission*

*Not admitted in the District of Maryland for the purpose of this case